## Houston, Appellant, *v.* Royston.

The legislature may establish inferior courts of chancery.

The act of the legislature of 1842, establishing a separate inferior court of chancery is a constitutional act.

By the thirteenth section of the act creating an inferior court of chancery, the governor was authorized to appoint a vice chancellor for the district, to hold his office until the next general election, 1843, and until his successor is qualified; but the act made no provision for the election of his successor, and no such election was authorized by the general law. The constitution requiring all officers to be elected for some limited term of time, it was decided that the vice chancellor held his office until the general election in 1843; but that portion of the act which directs that he shall hold until his successor is elected is void.

APPEAL from the inferior court of chancery.

The counsel for the appellees moved to strike the case from the docket, and assigned the following reasons:

1. Because the court has no power or jurisdiction to render any judgment in the case, it being an appeal from a supposed district chancery court at Holly Springs, and there being no such court known to the constitution and laws of the state of Mississippi.

2. Because the court has no power to render any judgment on a record unless the same be properly certified by the clerk of the proper court, and J. C. Anderson, who has certified the record in this case cannot be the clerk of the district chancery court at Holly Springs, there being no provision of law for election of a clerk of said court, and the authority given by the act of the legislature, approved 26th February, 1842, to the vice chancellor to appoint a clerk of said court being in direct contravention to the constitution of the state of Mississippi.

GHOLSON for the motion.

Two reasons have been assigned why this case should be stricken from the docket.

1. That the district chancery court at Holly Springs, from which the appeal has been taken, is a court not known to the constitution and laws of this state.

2. That the record is not certified by any clerk, there being no authority to appoint a clerk of the district chancery court at Holly Springs.

1. The first reason brings into question the constitutional power of the legislature to establish such a separate inferior court of chancery as is provided for by the act approved 26th February, 1842. The 24th section, art. 4, of the constitution provides "that the legislature may from time to time establish such other inferior courts as may be deemed necessary, and abolish the same whenever they shall deem it expedient." This provision is found after all the courts provided for by the constitution had been enumerated, and it must be gathered from other sections of the same article of the constitution what was meant by the term inferior. In the 19th section of the same article the same term, inferior courts, will be found. That section, after providing for the clerk of the High Court of Errors and Appeals, proceeds, "The clerks of the circuit, probate and other inferior courts shall be elected by the qualified electors of the respective counties, and shall hold their officers for the term of two years."

It is submitted for the consideration of the court, whether the constitution does not limit the power of the legislature in establishing inferior courts, to such courts as should have a jurisdiction only co-extensive with a county. It is admitted to be a leading feature of our new constitution, that all officers should be elected by the people. In the 19th section, before referred to, the intention is apparent that the clerks of such inferior courts as the legislature might create should be elected by the people; and by the term respective counties, it would seem to follow inevitably that the inferior courts could only have jurisdiction within the limits of a county.

The 16th section of the same article of the constitution provides that "A separate Superior Court of Chancery shall be established, with full jurisdiction in all matters of equity." Under a subsequent authority to establish inferior courts, if the legislature attempt to establish an inferior court of chancery, it should cer-

tainly be inferior and subordinate to the separate Superior Court of Chancery provided for in the constitution. It may be well questioned whether any inferior court of chancery could be established, the proceedings in which the chancellor might not at any time remove by *certiorari* into the Superior Court of Chancery.

If the above conclusions are sustainable, the act of the legislature conflicts with the constitution, because the inferior court of chancery established by it has jurisdiction over a district comprising several counties; and further, the inferior court of chancery so termed, is only nominally inferior, and the proceedings in it are not subject to be removed by the chancellor into the Superior Court of Chancery.

2. The 30th section of the declaration of rights provides that "no person shall ever be appointed or elected to any office in this state for life, or during good behavior; but the tenure of all offices shall be for some limited period of time," &c.

The 13th section of the act of the legislature, before referred to, provides that the governor shall appoint a vice-chancellor, "who shall hold his office by virtue of such appointment until the next general election in November, 1843, and until his successor is qualified." There is no provision in the act for the election of a successor, and no term of office prescribed for a successor.

It therefore follows, as a necessary consequence, that the term of office of the vice-chancellor, holding the court from which the appeal has been taken, is unlimited and in contravention of the article of the declaration of rights before referred to, and that the court so holden is an unconstitutional tribunal. This consequence seems to be inevitable, unless it can be shown that a successor can, as the law now stands, be elected. The court is bound to consider the law as it is, and contrast it with the constitution. Bryant *v.* The State, 1 How. 356.

No successor can be elected unless it can be established, by reference to the act under consideration, or some other act, 1. that there is a term of office for which to elect; 2. that there is an authority by law to hold an election.

It may be contended that the act, approved 25th December, 1833, How. & Hut. 326, providing "that the tenure of all offices in this state, not otherwise provided for by law, shall be limited

to four years," will extend to this case, and give a term of office to the successor of the vice-chancellor. It is apparent, from the terms of that act, that it only extends to offices then in existence, and not to such as might thereafter be created. By reference to the governor's message, which was delivered at that session of the legislature, it will be found that their attention was called to the fact that no term of office had been provided by law for any of the military officers of the state. The same difficulty existed in reference to the clerk of the superior court of chancery.

To find an authority to elect a successor, even if a term of office can be found, resort must be had either to an implication arising from the act of the legislature enacting the court, or to the general election laws. The authority, it is contended, can be obtained in neither way.

An irresistible objection to any authority arising from implication, is found in the first section of the act, by which a vice-chancellor is directed to be elected by the qualified electors of the district, "in the manner hereinafter provided." Upon examining the act, no provision is found. Can that omission of the legislature be supplied by any other power? Can the court imply what the legislature· say they intend to provide, but omit or forget? To do so would be unquestionably assuming legislative authority.

It is further contended, that such an authority as the ordering and holding an election, can never arise by implication; that it requires an express legislative enactment.

The general election law, How. & Hutch. 88, sec. 1, it will be found, only extends to offices under the constitution. The various acts passed at the first session in 1833, establishing the different courts, provide in each case for the manner and time of electing the judges. There will be found no general provision of law to embrace the case of an officer newly created and not known to the constitution.

It is again submitted, that both in reference to the term of office and the time and manner of election, it is clearly evident from the act that the legislature intended in that act to provide; that from some over sight the provision was not made, or in

making some amendment to the bill, was stricken out by mistake; and that nothing short of legislative power can supply the error or omission.

By reference to the journals of the senate, 1842, page 595, and comparing the bill as introduced with the bill as passed, the omission is most palpable; and it will appear, as has been supposed, that the mistake occurred by striking out a vital part of the bill, in order to introduce an amendment of a temporary character.

The second reason assigned for striking this case from the docket is, that the district chancery court at Holly Springs has not, nor can have, any clerk who can legally certify a record for the action of this court.

By the 19th section of the fourth article of the constitution, the clerks of the inferior courts which the legislature may create, are required to be elected by the qualified electors of the respective counties. By the act creating an inferior court of chancery, the clerks of that court are directed to be appointed by the vice-chancellor. Sec. 4. Acts of 1842, p. 59.

If it should be held that the legislature may create an inferior court, having jurisdiction over several counties, still the clerk of that court must, under the constitution, be elected by the qualified electors of those counties.

The court in this case will presume that the clerk is acting under the appointment of the vice-chancellor; and if that appointment be unconstitutional, it must of necessity determine that no credit or regard can be given to his acts. The court cannot presume that he was elected in accordance with the constitution, because there is no provision of law for that purpose, but one directly to the contrary.

The rule which sustains the acts of an officer *de facto,* cannot possibly apply to this case. To constitute an officer of any kind there must be an office. There certainly can be no officer *de facto,* unless there might be an officer *de jure.* The ground on which the acts of an officer *de facto* have been sustained is, that as to the persons affected by them, he is to be considered as the officer *de jure.*

Mr. Chief Justice SHARKEY delivered the opinion of the court.

A motion is made to strike this case from the docket, for the following reasons, to wit :

1. Because the court has no power or jurisdiction to render judgment, it being an appeal from a supposed district chancery court at Holly Springs, and there being no such court known to the constitution and laws of Mississippi.

2. Because the court has no power to render any judgment on a record, unless the same be properly certified by the clerk of the proper court; and J. C. Anderson, who has certified the record in this case, cannot be the clerk of the district chancery court at Holly Springs, there being no provision of law for the election of a clerk of said court, the authority given by the act of the legislature approved the 26th of February, 1842, to the vice chancellor, to appoint a clerk of said court, being in direct contravention of the constitution of the state of Mississippi.

On this motion the constitutionality of the inferior court of chancery in the northern part of the state, is brought directly in question. Inasmuch as some doubts have been entertained as to the constitutionality of that court, the motion was probably made as a test question, in order to have a point of so much importance settled.

The clause of the constitution which establishes the court of chancery and defines its jurisdiction, is the 16th section of the 4th article, and in these words : " A separate superior court of chancery shall be established, with full jurisdiction in all matters of equity : Provided however, the legislature may give to the circuit courts of each county equity jurisdiction in all cases where the value of the thing or amount in controversy, does not exceed five hundred dollars; also in all cases for divorce, and for the foreclosure of mortgages." The 4th article begins by declaring that " the judicial power of the state shall be vested in one High Court of Errors and Appeals, and such other courts of law and equity as are thereinafter provided for in the constitution." In the outset it is apparent that the convention intended to parcel out to the respective courts created by the constitution the entire judicial jurisdiction which might pertain to a state or government. None was left undisposed of. We cannot imagine any possible case

which is not cognizable by some one of the courts established, and yet we have the strongest possible reason for believing that the convention looked forward to some changes which might be suggested by experience, either from a defect in the practical application of the system then established, or from changes which might take place in the condition of the state. Hence they declared in the 24th section of the same article, that " the legislature might from time to time establish such other inferior courts as might be deemed necessary, and abolish the same whenever they should deem it expedient." This section is found near the close of the article which established all the courts, and conferred the entire jurisdiction of the state. Such a provision indicates that the convention thought that it might be convenient and proper to make some changes in the judicial system. Nothing else could have induced such a provision. And it must have been the design to clothe the legislature with power to make such changes. Such a provision was not inserted to give the legislature power to provide for the exercise of a jurisdiction which had not been disposed of, for it was all appropriately vested by the constitution; none remained for legislative disposition. The power therefore to create inferior courts, necessarily implies the power to clothe them when created with a part of the jurisdiction which had been vested in the courts established by the constitution; otherwise they could have no jurisdiction whatever, for the constitution had disposed of all. Any other supposition leads to a charge of absurdity in the convention, in having done a useless and unmeaning act; and such a presumption is not to be indulged, when the act can have a sensible application. It cannot be doubted that the legislature has power to establish some inferior courts. What is meant by an inferior court, in the sense in which that term is used in the 24th section? The article alluded to enumerates all the courts of the state, beginning with the High Court of Errors and Appeals, and ending with the courts of justices of the peace. Now does the article mean by inferior courts, such courts only as are inferior or below all of those mentioned, even down to a justice's court? I do not so understand it; but I understand it to mean that when the legislature created a court and gave it jurisdiction, that it must be inferior to the court created by the constitution, whose jurisdic-

tion was of the same character as that given to the new court by the legislature. Thus, if the legislature wished to create a court which should exercise a part of the jurisdiction now exercised by the circuit courts, they could only do so by creating a court inferior to the circuit court. For instance: the criminal court exercised jurisdiction given by the constitution to the circuit court, but it was inferior to the circuit court, and on this ground was held to be constitutional; still in the ordinary acceptation of the term, it was superior to other courts, or might have been so in dignity and extent of jurisdiction.

Is there any thing in the constitution which gives the court of chancery such exclusive jurisdiction as to induce a belief that no portion of the equity jurisdiction of the state can be conferred on such inferior courts as the legislature may rightfully establish? It is a separate superior court of chancery with full jurisdiction in all matters of equity. It is separate because the convention intended that the common law courts should not exercise equity jurisdiction. In some of our sister states there is no separate court of chancery, the jurisdiction rightly belonging to such a court being exercised by the common law judges. In others the two jurisdictions are in some degree blended. A different system was intended to be engrafted in the constitution. Our former constitution authorized the legislature to establish a separate court of chancery, and clothed the circuit courts with chancery jurisdiction in the mean time. Ultimately a court of chancery was established, but a portion of the state was disatisfied with it, and repeated efforts were made to abolish it, and vest its jurisdiction in the circuit courts. To place this on a more certain foundation, its existence was fixed by the constitution; its jurisdiction is separate and full; that is, separate from the courts of law in all matters of equity jurisdiction; and to prevent the transfer of its jurisdiction and keep it a separate tribunal, the convention declared by a proviso what jurisdiction rightfully belonging to a court of chancery might be transferred to the courts of law. The effect is to prevent the transfer to those courts of any further equity jurisdiction. And it is a "superior" court. The word superior must be understood as a relative term. It does not mean that it is superior or above all other courts, but it means that this shall be supe-

rior to all other courts which may exercise equity jurisdiction. The very use of this term would seem to imply the existence of, or power to create inferior courts of chancery, else why use it at all? It cannot, in the legal acceptation of the term, be said to be superior to any of the courts of law, because it has no supervisory appellate power, except indeed as to the probate courts. It must be superior to something of its own kind, then. In the regular gradation of courts it has no place among them. It is separate from the other courts, and the term "superior" can only be understood to mean that it is to be superior to any other court of the kind. This word, taken in connection with the power given in the 24th section to establish inferior courts, is in harmony with that provision, and intelligible; but unconnected with that provision it is unintelligible. Now we must construe one provision by another, and give a sensible meaning to the whole, if it will bear it. No term used is to be considered as useless, when it will properly bear a different construction; but all are to be regarded as having been used with a view to a design and meaning. Declaring this to be a Superior Court of Chancery, was in effect to declare that if the legislature should think proper to act under the 24th section, and establish another court to exercise equity jurisdiction, it must be inferior and subject to a supervisory power in the superior court of chancery. The legislature can do no more than give it a concurrent jurisdiction, for it cannot divest jurisdiction already vested, and the superior court of chancery has "full jurisdiction in all matters of equity." Then we conclude that the superior court of chancery is not so exclusive in its character as to prevent the legislature from acting under the 24th section, and establishing inferior courts with equity jurisdiction. There is one limitation which the legislature must observe. It cannot vest equity jurisdiction in a court of law. The jurisdictions are to be kept separate and distinct. The case of the United States *v.* Ravara, 2 Dallas, 297, accords with these views.

Has the legislature exercised its power in such a manner as to make its act valid?

The court is established under the name of an inferior court of chancery. This does not necessarily make it inferior, but it affords some evidence or indication of what was intended to be its

true character. It has but sectional or district jurisdiction, whilst the jurisdiction of the superior court of chancery is general. Within its district its jurisdiction is only concurrent; parties therefore may, in the first instance, if they choose, resort to the superior court. This could not have been directed otherwise, as the constitution vested full jurisdiction in the superior court of chancery. Its jurisdiction is limited to a certain amount, but the amount is so large that this provision looks like evasion, and is in reality a circumstance which operates against the constitutionality of the court. Defendants residing out of the district, or non-residents, may remove the cause to the superior court, provided the application be made within a given time, and proper showing made; and even defendants residing within the district may remove a cause pending, if justice require it; and finally an appeal lies in all cases to the superior court of chancery. An appeal, by consent of parties, may be taken directly to the high court of errors and appeals, or a cause may be brought to that court by writ of error. None of these provisions profess, either directly or indirectly, to interfere with the jurisdiction of the superior court of chancery, and they are all characteristic of an inferior court—inferior not only to the court of last resort, but to the superior court of chancery. It is, then, an inferior court, within what we have said was the meaning of that provision which authorizes the legislature to establish such other inferior courts as might be deemed necessary. Thomas *v.* The State, 5 How. 20.

It has been urged in argument, that the act is unconstitutional or invalid, because the incumbent holds for life, or during good behavior, there being no provision in the act or in the general law by which a successor can be elected, and he being authorized to hold until his successor should be qualified. By the 13th section of the act, the governor was authorized to appoint a vice chancellor for the district, to hold his office "until the next general election in 1843, and until his successor is qualified." If there be no law by which a successor can be qualified, then that portion of the act which directs that he shall hold over his term, is void, and his term expires in November, 1843. It is merely a void provision or condition engrafted on a valid act. This does not destroy the office before November, 1843. Until that time it can

be constitutionally filled by an incumbent, and the acts of that incumbent must be valid.   It was competent to create the office and provide subsequently for an incumbent.   Being competent for the legislature to create the office and fill it, the act is valid so long as it can be carried out, and if by improvident legislation the act must cease to operate at a particular time for want of ample provisions, it is nevertheless a valid law, so long as it can operate. Considering, therefore, the acts of the present incumbent valid so long as he can legally continue in office, it is perhaps premature to determine whether a successor can be elected under the existing laws; as it is an important question, however, and one which has been discussed at some length, an indication may not be unacceptable.

This is a question of great difficulty in carrying out the act. In reference to all other officers, there is a law authorizing their election, and prescribing the manner of election.   In this case there is no such law, and it is difficult to perceive how this officer can be elected.   He cannot be elected under any general law, for there is none which will authorize it.   It is not with this court to prescribe the law.   If the directions of an act of the legislature cannot be executed in the manner prescribed, whether the defect proceed from a mistake or inattention of the legislature, no court of justice can supply the deficiency.   Binney's case, 2 Bland, 152; Thomson *v.* Grand Gulf Bank, 3 Howard, 240.   The legislation in this instance is defective, and there seems to be no provision in the general law which will cure the defect, and it is not for the courts of the country to aid the defect by substituting remedies which do not exist.

Motion overruled.